No. 68288.—Air Express International Agency, Inc., a/c Hyland Laboratories *v.* United States, protest 60/25184 (Los Angeles).

WILSON, Judge: The plaintiff in this case protests the classification and assessment of certain serum at the rate of 10½ per centum ad valorem under paragraph 5 of the Tariff Act of 1930, as modified by the Sixth Protocol to the General Agreement on Tariffs and Trade, T.D. 54108, as other chemical compounds, not specially provided for. It is claimed that the importation is properly classifiable free of duty under paragraph 1610 of the act as serum for therapeutic purposes.

The facts in the case are not in dispute. In brief, as taken from the testimony of Dr. John W. Palmer, they are as follows: Hyland Laboratories of Los Angeles, Calif., imported certain human blood serum obtained in the following manner: From the blood, as withdrawn from the human body, is removed all the blood cells together with all the solids in the blood which will coagulate. The clear fluid remaining constitutes the serum. When this product was received by Hyland Laboratories, certain "unwanted extraneous antibodies which are normally present in human blood" were removed. In other words, certain undesirable impurities were extracted from the serum. After being sterilized, it was placed in small bottles and sold to hospitals, laboratories, clinical laboratories, blood banks, and similar users.

Dr. Palmer, not an M.D., but the holder of a Ph. D. from Columbia in biochemistry and a trained technician in clinical hospital and laboratory work, was the only witness called in the case. For 3 years after obtaining his Ph. D. degree, he was employed in the clinical laboratory of Columbia University in Presbyterian Hospital Eye Institute; thereafter, he worked for E. R. Squibb & Sons Biological Laboratories in New Brunswick, N.J., during which time he worked on the "production and development and research work in biological drug product." In 1952, he entered the employ of Hyland Laboratories where he became director of biological production and technical director, responsible for the "technical aspects of all their operations, production, research and control." Dr. Palmer is a member of the American Chemical Society, American Society of Immunologists, New York Academy of Sciences, and several other American public health association. Concerning the use of the serum, Dr. Palmer testified more definitely as follows:

Q. And specifically when they receive this type of serum what do they do with it?—A. They use it to determine the blood group of potential recipients of the blood transfusion or the blood group of a potential donor for blood transfusion.

Q. And how is this done generally?—A. By mixing a drop or so of the serum with a drop or so of the cells from the blood to be tested, either on a glass slide or small test tube. If the blood contains the factor which, or for which the serum has an antibody its cells are agglutinated or hemolyzed by that kind of mixture.

Q. Now, what is done with this serum after the grouping tests are made?— A. It is discarded.

Q. And what is done with the information which is obtained from this grouping?—A. Well, by means of the information obtained it is then possible to ascertain whether the proposed blood to be used as donors' blood can serve the proposed recipient without untoward reactions.

Q. Now, if these tests are not made, and improper blood is transfused, what is the result?

\*   \*   \*   \*   \*   \*   \*

A. The person receiving an incompatible blood may react by destroying the cells transfused, or by having his own cells destroyed by the transfused blood,

in which case a great amount of hemoglobin is set loose in the blood stream, damage is done to kidneys, and the consequences can be fatal.

\* \* \* \* \* \* \*

Q. And if this transfusion is compatible, the blood itself, compatible, what is the effect then?—A. In the case of a compatible transfusion the cells received and the blood received is treated as if it were the recipient's own blood; nothing untoward happens, but he does receive benefit from the use of it, presumably, if the doctor has prescribed wisely.

Dr. Palmer then testified that the common use of transfusions "is for the replacement of blood lost or for the building up of blood pressure due to hemorrhaging at times of shock, trauma, accidents, surgery—things of that sort." The witness considered the use of the blood as "therapeutic," which term he described as something which contributes to the healing or repair of injuries, or prevention of illness in the person receiving the therapeutic treatment (R. 8–11). He further stated that the importation of serum, such as here involved, is covered by the United States Public Health Service Act, testifying, in this connection, as follows:

Q. Under the regulations is this product which you have imported specifically covered?—A. Yes, it is.

Q. And how is it covered?—A. Under the regulations issued under this Act, Section 73.1 sub-section (k), "A product is deemed applicable to the prevention, treatment or cure of diseases or injuries of man, irrespective of the mode of administration or application recommended, including use when intended, through administration or application to a person, as an aid in diagnosis or in evaluating the degree of susceptibility or immunity possessed by a person, and including also any other use for purposes of diagnosis if the diagnostic substance so used is prepared from or with the aid of a biological product."

Q. Does your company specialize in this type of product?—A. Our company is primarily interested in such as these from human blood, in this type of product.

Q. Producing it?—A. Yes.

Q. Are there other methods of grouping blood?—A. Not in common use. \* \* \*

Q. And why is this type of serum, after you further process it, best suited for the function of grouping blood?—A. This being derived from human blood, will stand a better chance of getting the correct answer in using that than any other type of product prepared either in other animals or from vegetable sources. \* \* \*

Q. And what with regard to the facility of use?—A. Certainly more frequently used than any other possible way of determining the same thing; sometimes time is very important in those uses.

Q. And does it require someone with experience to handle them?—A. Yes, it does. [R. 11–14.]

On cross-examination, Dr. Palmer stated that the serum in question is never injected directly into the human system, but is used as a reagent in determining the compatibility of blood for transfusions (R. 15). The witness also testified that, in its condition as imported, the involved serum is concerned with remedies for diseases, in that it helps "choose the proper one" (R. 16). On redirect examination, Dr. Palmer further testified that, in his opinion, this human serum is very definitely used for therapeutic purposes, in that "it is used to select the proper therapeutic agent," i.e., the proper blood group or type to be administered to a patient (R. 16).

The issue in this case then very definitely boils down to the question whether the imported serum is used for therapeutic purposes.

The statutes involved are as follows:

Classified under:

Paragraph 5 of the Tariff Act of 1930, as modified by the Sixth Protocol to the General Agreement on Tariffs and Trade, T.D. 54108:

All chemical elements, all chemical salts and compounds, all medicinal preparations, and all combinations and mixtures of any of the foregoing, all the foregoing obtained naturally or artificially and not specially provided for, whether or not in any form or container specified in paragraph 23, Tariff Act of 1930 (except the following: ammonium silicofluoride; barium compounds; beryllium oxide or carbonate; hutyrolactone; caesium chloride; calcium hypochlorite; ergotamine tartrate; fatty alcohols and fatty acids, sulphated, and salts of sulphated fatty acids; Haarlem oil; medicinal preparations other than vitamins; monosodium glutamate preparations; products chiefly used as assistants in preparing or finishing textiles; salts derived from vegetable oils, animal oils, fish oils, animal fats or greases, or from fatty acids thereof; salts and compounds of gluconic acid and combinations and mixtures of any such salts or compounds; sodium alginate; tellurium compounds; 2-pyrrolidone; N-methyl-2-pyrrolidone; and zinc arsenate).

Claimed under:

Paragraph 1610 of the Tariff Act of 1930:

Antitoxins, vaccines, viruses, serums, and bacterins, used for therapeutic purposes.

In its brief, the Government argues at some length that, since the serum after its importation is processed for the removal of certain unwanted antibodies or impurities, the imported merchandise is not used at all in its imported condition, but is further manufactured or processed after its receipt by the Hyland Laboratories. However, we are of opinion this position is untenable. In our view, all that was done to the serum after its importation was to remove from it certain unwanted impurities. The sole issue, therefore, as hereinbefore stated, is— does the imported serum for tariff classification purposes fall under the provisions of paragraph 1610 of the Tariff Act of 1930 as serums used for therapeutic purposes? We believe that it does and that it should have been so classified. Dr. Palmer, while not a doctor of medicine, is exceptionally well trained and experienced in the production and use of serums of the kind here involved. His testimony that the imported serum was used for therapeutic purposes, in the absence of any evidence to the contrary, is, in our opinion, entitled to some weight.

There appear to be no adjudicated cases bearing upon the question to be resolved. However, the blood serum under discussion, in our opinion, does fall under the definition of serums used for therapeutic purposes, i.e., for the treatment of injuries and diseases of human beings. Webster's New Collegiate Dictionary, second edition, 1956, defines serum as follows:

serum * * * 1. The watery portion of an animal fluid remaining after coagulation; esp.: a Blood serum; often, specif., immune blood serum, which contains specific immune bodies, as antitoxins or agglutinins; as, antitoxic serum. * * *

The same authority defines therapeutic as follows:

therapeutic * * * Med. Of or pertaining to the healing art; concerned with remedies for diseases; curative.

In the Encyclopaedia Britannica, volume 22, 1946, page 71, is found the following statement:

THERAPEUTICS, the name given to that branch of medicine which deals with the means employed to prevent or cure disease if possible, or to control and lessen its evil results when a cure is impossible.

The Stormonth English Dictionary, published in 1885, on page 1045, defined therapeutics as follows:

therapeutics * * * that department of medicine which relates to the discovery and application of remedies for diseases: * * *.

The United States Pharmacopeia, fifteenth revision, pages 846–48, presents the following discussion:

## BIOLOGICAL REAGENTS FOR CLINICAL TESTS

Diagnostic aids covered by this Pharmacopeia are separated into those that are used directly upon the patient, and those that are used in clinical tests on the patient's blood or otherwise apart from his person. The aids of the first-named group are covered in the monograph section, while specifications for those in the latter group are set forth in this section.

### Blood Grouping and Typing Serums

#### ANTI-A BLOOD GROUPING SERUM

Anti-A Blood Grouping Serum is derived from high-titered serums of humans, with or without stimulation by the injection of group-specific red cells or substances. It agglutinates human red cells containing A-agglutinogens; i.e., blood groups A and AB (including subgroups $A_1$, $A_2$, $A_3$, $A_1B$, and $A_2B$). It may contain a suitable anti-bacterial preservative.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Other requirements—Anti-A Blood Grouping Serum complies with the sterility, hemoglobin, potency, and avidity tests and other requirements of the National Institutes of Health of the United States Public Health Service, including the release of each lot individually before its distribution.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

There is a similar description for Anti-B Blood Grouping Serum and Anti-Rh Typing Serums. It would appear, therefore, that frequent tests are made before the direct use of any substance for administration to a human being to determine whether the substance is suitable for the purpose in mind.

There is also to be found in the law books brief discussions on this question.

The term "treatment," under the general heading of physicians and surgeons, is discussed in 70 C.J.S. 817, as follows:

Treatment. The act or manner of treating or applying remedies to; the mode or course pursued for remedial purposes; the means employed in the cure of disease; the management of disease or diseased patients. In common parlance, and often in the law, "treatment" is a broad term covering all the steps taken to effect a cure of an injury or disease. The word includes examination and diagnosis as well as application of remedies; it includes not merely the actual operation in a surgical case or the giving of a prescription in a nonsurgical case, but also the preliminary examination, including sometimes an exploratory operation or exploratory examination. Treatment may, and generally does, include three stages, namely, preliminary, main, and final; and whatever is usually done to the patient or administered to him by a skilled physican or surgeon in any one of these states is properly included under the term "treatment" even though it may not be an indispensable prerequisite. * * *

The latter text is supported by the following adjudicated cases: Kirschner v. Equitable Life Assur. Soc. of United States, 284 N.Y. Supp. 506; Hester v. Ford, 130 So. 203.

It is well to note also that in the Summary of Tariff Information, 1929, relative to predecessor paragraph 1510 of the act of 1922, the Tariff Commission made the following statement for the use of the Committee on Ways and Means of the House of Representatives, pages 2192–94:

Description and uses.—Antitoxins, vaccine virus, serums, etc., are used in the prevention diognosis [sic], and treatment of disease in man and animals. The

use of an individual vaccine or antitoxin is usually limited to a particular disease. The sale and propagation of these products are controlled by the Public Health Service under the act of July 1, 1902, whereby the importation, exportation, or interstate sale of such products, designed for human use, is forbidden unless the manufacturer be licensed by the Secretary of the Treasury. The following definitions are given in section 7 of the Regulations for the Sale of Viruses, Serums, Toxins, and Analogous Products:

\*　　\*　　\*　　\*　　\*　　\*　　\*

It would, therefore, seem that a serum may be considered then as a substance used in the treatment of disease, or for therapeutic purposes, when used in "examination and diagnosis" of remedies.

The Government, in contending that the imported blood serum is not properly classifiable as a serum for therapeutic purposes, as provided for in paragraph 1610 of the Tariff Act of 1930, argues, in its brief, that the serum is not used for direct treatment of human ailments, that is, that it is not directly injected or transfused into the human system. We think, however, for the reasons hereinbefore set forth, that this construction is too restrictive and rigid and that, under all the facts in this case, the merchandise is properly classifiable free of duty under paragraph 1610, *supra*, as claimed.

The protest will, therefore, be sustained and judgment entered accordingly.